Good morning, Your Honors, and may it please the Court, I'm Maxwell Bleacher, and along with Lauren Silver, we represent the plaintiff, Apollon. I'm going to try to simplify and focus what I think has been an overexpanded briefing. The issues that emerged from Judge Chesney's ruling below are fairly simple and can be resolved by traditional application of Rule 12b-6 standards. To set the table, prior to May of 2009, the plaintiff and the defendant, Jim Care, were in a competitive infrastructure which existed with respect to providing patient care for inmates incarcerated in Central California. Each operated under a non-exclusive contract with the California Department of Corrections and Rehabilitation. Each provided that care essentially through the Mercy Hospital in Bakersfield, because that hospital is peculiarly equipped to deal with and has a separate section to deal with prisoners. These two entities were specialized providers of health care to inmates. The hospital operated under a specific contract, Mercy Hospital, that is, with the California Department of Corrections and Rehabilitation, which was necessary for anybody to bring patients to that hospital to provide medical care. In May of 2009, the defendant, Jim Care, and the defendant, Mercy, entered into an exclusive dealing contract, the practical effect of which was to kick Colonial out of the business of providing medical care. Counsel, I just want to make sure that I understand the arrangement. The doctors from Colonial may still practice at Mercy, is that correct? Correct, Your Honor. And they can treat prisoners at Mercy, is that correct? Correct. Okay. But there is an exclusive referral service. You were very careful in your language. I want to make sure that I understand that your language was as precise as you intended it. You said the practical effect of this was to exclude Colonial. Yes. I think that I'm trying to be understated. The exclusive dealing contract would, if applied literally in all cases, would actually preclude any Colonial physician from taking care of an inmate because Mercy was required to deal only Mercy and Jim Care agreed that all the patient care would be provided by Jim Care. And are those for patients who are admitted through the emergency room? Excuse me, Your Honor. Is that only for patients who are admitted through the emergency room? Was that a further limitation? No, because the patients admitted through the emergency care that actually became hospitalized in the secured facility at Mercy were also then tended to by Jim Care. In other words, it's an exclusionary arrangement. Well, your complaint mentions there are at least two other hospitals that treat CDCR inmates. Can you admit to those hospitals? Are there other hospitals? Yes, because I think you mentioned two other hospitals. There's two other hospitals in the Catholic health care chain, Catholic health care west chain, that do provide a very small number, that do accommodate a very small number of inmates. For practical purposes, if this case reaches a litigation stage, the emphasis is going to be on Mercy because Mercy treated the overwhelming number of inmates. And that's because they have a secure facility, a secure wing with 28 beds. Their facility and the required contract with the state of California. Are prisoners treated at other hospitals other than those within the Catholic health care system? They may be on an emergency basis because California, as you know, has very strong policy that all emergency cases must be treated regardless of whether there's some contractual constraint. So prisoners, in fact, are treated at other hospitals other than Mercy. It's just that you have to have posted guard at the door rather than having a secure wing. But this is the rare exception. The rule is that if a prisoner gets ill or injured in the ordinary course of events, there would have been some competition, some interplay between the two providers of medical care that is now eliminated by the exclusive dealing contract. How far of an area around Bakersfield are we talking that prisoners will be brought? Are they brought in from Fresno and Merced and Modesto? Yes. We have listed all the prisons in Central California in the state system. Are they brought in from Sacramento? No, I don't think it goes that far. Mostly in Kern and King County. They're all in the complaint. I can find it for you. But there are a considerable number of both men's and women's prisons in Central California that are subject to the contract. Okay. Is it all prisons in the Central Valley? We're not talking about prisons over the Tehachapi's into Barstow area or San Bernardino County. No, we've alleged, as the required geographic market and antitrust cases, we've alleged Central California. And, frankly, I don't think that definition was challenged below or ruled upon by the district court. So I think that's okay. Our real question, the real question that's emerged from the dismissal of a complaint twice, there are two that I think are overriding questions. One is, does this complaint as amended have a, quote, fatal legal defect and or, in different words, is it facially unsustainable in the allegations of the relevant product market? Or does it survive scrutiny under 12v6 to be tested by summary judgment or trial, because relevant market is typically an intense factual inquiry into the commercial realities of the marketplace? The second issue is whether or not it's reasonably inferable from the complaint that there is a degree of foreclosure which creates a justiciable issue on the basis of the complaint in respect to whether there's an unreasonable restraint of trade. Now, I suggest to you that all of those questions can be answered by a careful reading, and I hope to walk through it very quickly for you, a careful reading of this Court's decision in New Cal Industries v. ICON, which is at 513F1038, a 2008 decision authored by Judge Thomas along with Judge Kleinfeld and District Judge Burgess of Alaska. Now, what do we learn if we look at New Cal? New Cal said that, using my language, unless the complaint has a fatal legal defect, that is, it's facially unsustainable, just by looking at it, you can say, this market definition can't stand, it's crazy, it's not consistent with commercial reality. Then you can dismiss a complaint under 12v6 based on the pleading of relevant market. But as the Court there said, the validity of relevant market is typically a factual element rather than a legal element, and alleged markets may survive scrutiny under 12v6 subject to factual testing by summary judgment or trial. Paraphrasing then, because the market definition depends upon a factual inquiry and that a commercial reality is faced by consumers, that's at page 1045. And to me, consistent with Judge Bybee's recent statement in the Lacey case that says, all you do is take the factual allegations of the complaint as true and give the plaintiff all the inferences, we're done. We're done. This Court has said, in looking at relevant market allegations, you only can strike them if they're facially wrong. Now, we have an allegation that the relevant market is the provision of medical services to incarcerated prisoners at hospitals which are guarded or secured. And facially, that is not unsustainable. That is perfectly logical. And why is it logical? Because we now go back to the right column on page 1045 in NUCAL, and the Court said, you don't have to stay with the broad general market. No, no, no. The Court said, there can be a restraint of trade, quote, of a small part of the general market of substitutable products. And they call that, they went on to call that a sub-market. And all you need to allege is whether that sub-market is economically distinct from the general product market. Now, of course, the general product market here would be the provision of all medical services to anyone. That would be, but the question that you need to look at, according to NUCAL, is has the plaintiff made out a case for a sub-market based on, quote, economically distinct factors? And we have. We specifically allege these things, Your Honors. One, that the provision of medical services to prisoners involves a specialized group of providers. Two, it requires a contract with the California Department of Corrections and Rehabilitation. Three, it requires that the services be provided normally at a facility with guarded or secured facilities. Recognize that you could probably take a prisoner to any hospital in the county or in the area, but those hospitals don't like having three guards in their hallway to take care of them. And so the tendency always has been that these patients go to Mercy because Mercy has 29 rooms on a separate floor to accommodate these people. I'm sorry, go ahead. I'm sorry. The appellees argue that your definition is underinclusive. Yes. What's your response to that? The response to that is what I just told you with due respect. But help me understand. That's a factual issue. We're not there yet. We don't need to negate every possible substitute. We need to allege a relevant market that's not facially unsustainable. This market doesn't qualify as facially unsustainable. It says it's a provision of medical care. That's the product. And then it's limited to a group of people. Now, you ask the question, can you limit it to a group of people? And I'm reading from you that that is a submarket perfectly acceptable and the basis on which the New Cal markets were sustained. Not only that, they said in New Cal at the next page, 1046, an antitrust plaintiff may restrict its alleged market to consumers of Kodak products. In other words, you can have a market that's constrained by who the consumers are. It's a submarket. Counsel, as long as you're on page 1046, I'd like you to look at the next column. Yes. And I'd like you to look at the discussion of the dominoes of the Queen City pizza case, the dominoes pizza case. Yes. And there I'm particularly looking at the second full paragraph on the right column, the begins, the Third Circuit held. Yes. No, I'm going to invite you with due respect to the next page, at 1047, where the Court explains what that contractual obligation was. And it says that the domino franchisees came in and attacked the idea that they had to  use to make pizza only from dominoes, even though the dough and the other stuff was reasonably interchangeable with all other pizza ingredients. But what caused the Court to throw the Queen City case out is that they said the members, franchisees, signed an agreement agreeing to that. Counsel, if your theory is right, does that mean that if Mercy Hospital had an exclusive contract to purchase scalpels from one company, that a competitor scalpel-producing company could come in and allege an antitrust violation? Well, there's lots of cases having to do with the exclusion of medical equipment suppliers. And I don't know that it would be illegal. You'd have to know all the surrounding facts. But there certainly could be a claim for exclusive dealing, yes. But you think that there is a possibility of an antitrust violation? There is absolutely a possibility. Anytime you have an exclusive dealing arrangement, you have a rule of reason. So you're going to have to see how many people are out there, what's the effect of the market foreclosure. There are a lot of issues. A single hospital entering into what they regard as a very favorable contract for the purchase of scalpels, and they cannot do that? Well. That seems like a pretty severe rule. It probably would not be successful if there's out there other hospitals to whom the other scalpel manufacturers can sell. So you'd have to look at, in your case, not that you're forcing me to analyze it, in your case, if Mercy Hospital were one of 20,000 hospitals that buy scalpels, I can't see how the plaintiffs would win. That might be facially unsustainable. But if you had a group of hospitals that had a relatively high market share, such that the foreclosure of the competing scalpel manufacturers would affect competition, then you could stay in court. Counsel, why didn't you include within the defined market men and women confined in county jails? We did. Well, not county jails. We included the federal and state prison facilities. Because, Your Honor, there's no obligation anywhere written in any case that I know of that said that we have to go down a list and exclude other potential hospitals or competitors. You see, that's the factual inquiry. I wasn't asking you about other hospitals. Other jails. Other potential patients. The market for the services. What's the difference between someone confined in a state jail or a county jail? Because the difference is because under the California law, the state has an obligation to provide medical service for its inmates. The federal government does that in a completely different way than operates here. What about counties? Same thing. It's different. It's different. And these are the factual nuances that I think are significant. I'm not saying they're irrelevant and we should toss them out the window. I'm saying we're not there yet. These are the factual nuances which Judge Thomas's opinion teaches us come at a different stage. All we're looking at now is have we properly alleged a market which is not fatally defective or facially unsupportable, unsustainable? And I think we have. And Queen City, carefully analyzed, really isn't a relevant market case. It's an estoppel or waiver case. If you look at the first full paragraph in the left column on 10-4. You're well over your time. You're two minutes over your time. I am going to allow you a minute to respond. Thank you. Let me just make one final observation on the issue of whether we properly alleged an antitrust restraint. If you go to 10-51 of NUCL in the right column, it said. Counsel, we've got the case. So I think we're prepared on that. Thank you. Thank you, Your Honor. Good morning, and may it please the Court. I'm Martin Thompson. I represent the defendant, Catholic Healthcare West. My partner, Barry Landsberg, also represents Catholic Healthcare West. He's here at counsel table. And Mr. Miller at counsel table represents the other two defendants, GEM Care and Managed Care Systems. Are you splitting time? I was going to get to it. He'd like to reserve a minute or two in case there are issues unique to his defendants, Managed Care Systems. You'll need to monitor your time. So you'll have to cede him time from off of your, off of the total time there for counsel. And I'd be happy to do that, and I'll try to watch the clock on that point. The arguments presented by counsel today are very similar to the arguments presented to the district court, which would lead to the conclusion that for some reason a plaintiff in an antitrust case has carte blanche to plead a very arbitrary and not quite plausible product market, and that's what we, and the district court made it clear that's not true. The counsel has argued and they've argued before that the product market is inherently so factual that they should be allowed to simply plead what they want and then proceed on to discovery. That's not the case. The courts, including this court, have been emphatic that markets must be defined in the pleadings in certain ways to meet certain standards. Judge Chesney cited a couple of Ninth Circuit cases in which cases had been dismissed for failure to accurately or adequately plead a legally cognizable product market. And I noted, and we sent in a supplemental letter, within the last 30 days, this court has once again reiterated exactly that same conclusion in the Golden Gate case dismissing on the pleadings, an antitrust case, also came up from Judge Chesney coincidentally, for failure to plead a product market with reference to the rule of interchangeable use, basically without reference to what products are inherently capable of similar uses. Here the product in question that's been acknowledged is medical services. Doctors provide medical services. The next question is to whom do they provide them? Plaintiff has tried to limit the product market to certain categories of customers, which it apparently prefers to deal with. They aren't entitled to simply make a choice of who their preferred customers are and thereby narrow the definition of the product market. The product market is based on products. In the Golden Gate case, it was noted the plaintiff had failed to plead with reference to what types of products have interchangeable uses here. Sotomayor, the opposing counsel argues that the sub-market is allowed under Newcal. What's your response to that? The sub-market concept was actually first brought up by the U.S. Supreme Court in Brown's shoe case. And in that case and in every case since then, it's been noted a sub-market has to comply with the same standards as a market definition. Sub-market isn't a different way of defining a market. It's a way that it can be said there are multiple markets, maybe within a large market. They said medical services. There could be a sub-market, for instance, for cardiology services. It could be because cardiologists compete with each other to get certain, to provide services of a similar nature.  What they want is to define a sub-market or simply to narrow the market definition to certain preferred customers. That's not part of product market definition. Product market is defined based on the products. The question of to whom the product can be sold, who are the viable customers, that's a question for the foreclosure analysis. Now, I admit there is a tendency, I think, in talking about these things and even in some of the cases to combine the product market analysis with the foreclosure analysis. It's not necessarily erroneous to do it all at once because you reach the same result one way or the other. It's better analytically to keep them separate. First, we say what products have interchangeable use. Cardiologists compete with other cardiologists. Internists with other internists, that kind of a thing. Then you look at the question, once you define the product market based upon products, then we look at the question, to whom can these products be sold? And that's where the flaw in the plaintiff's approach becomes more apparent by breaking down the two issues separately. They're saying, yes, we compete to provide medical services. They define GEMCARE as an organization which sells medical services to individuals. We know medical services can be sold to individuals. That's who uses medical services. They want to then say, but we only want to focus on, but first it was one customer, CDCR. It's clear you can't just focus on one customer. They use NuCal, but NuCal is a different situation. It's really unique. There's a whole line of cases called the derivative aftermarket cases. They have nothing to do with our case. These are situations where somebody buys, a class of customers buy durable products and after that for a period of years are confined to aftermarket products, repair products, which fit those initial products, but it's a multiyear, durable product, unique situation. There's no allegation in our case that there's a derivative aftermarket. As NuCal said, there have to be two sets of demand functions, really, for the two different markets in question. We don't have two markets. We don't have two demand functions. We have one market. The question is, what's the scope of that market? And that leads to the question, after you define the products that are being sold, to whom can you sell them? And the case law from this circuit and other circuits is abundantly clear. You can sell them to anybody who is a potential purchaser, actual or potential purchaser. The Omega case makes it very clear from this court that sellers must go out and use some real effort to find customers. The whole idea of the competitive process here is that people compete within a market to sell business to various customers. There's going to be some vendors that are happy because they got the business, some vendors that are unhappy. They didn't get the business. The whole idea is after that part of the competitive process occurs, then the disappointed vendors should be trying that much harder to sell to the remaining customers. Who are the remaining customers here? Judge Chesney pointed out they've got two hurdles to get to, to try to limit the remaining customers the way they'd like to. In the first complaint, they said, we only want to sell to CDCR. She said, it doesn't make any sense. If for some reason you want to try to say you can't sell to individuals, all individuals just like GenCare does, and you want to say we're only going to sell to custodial patients, you've got to at least include the universe of custodial patients as a starting point and then explain why they're different from other customers, why other customers are not available to you, why you're foreclosed from that part of the market. And if you want to define custodial patients, the first step is to say, what about the rest of the custodial patients? What about city and county custodial patients? Well, they came back and amended the complaint and added one other category of custodial service, and that was federal prisons. They completely ignored county patients, city patients, all the other detainees that Judge Chesney said, what about those? The only thing they've said is, we have to have a contract with CDCR to serve CDCR patients. Mercy is not alleged to have taken any action to restrain CDCR from contracting with any hospital it chooses to in order to send their patients to those hospitals. Mercy has imposed no restraint on the rest of the market. Plaintiff acknowledges in its brief, the conduct of Mercy may have had no effect on any other provider in this market. That's a critical admission right there. I understand that Colonial is capable of treating DOC patients at hospitals, including Mercy. Would it be a violation of the antitrust laws if the Department of Corrections entered into an exclusive dealing contract? In other words, if they went to Mercy and said, look, you're a central hospital for these prisons, and you're going to treat all of our patients? No, it would not, and we certainly could not say that it could be from this complaint, because first of all, Colonial will still have available to it all other patients except for those CDCR patients subject to the hypothetical contract that the Court mentioned. We don't know how many of those are. Those could include any other category of patients that Colonial chooses to serve. They could include HMO patients, PPO patients, federal prison patients, county prison patients, city detainee patients. We don't know. That's the universe of patients that is still available to them. So the question isn't are they foreclosed by an exclusive contract from serving the business that is the subject of that contract. That's what they first tried to allege. Every exclusive contract would be illegal if the market was defined as simply the business covered under that contract. The question is who else is available to these particular vendors of medical services? The answer is, well, if they want to focus on detainees, city patients, county patients, federal patients, they admit federal patients are even in the market that they'd like to serve, they just haven't succeeded in getting the contract there. There's no reason they can't also sell to HMO patients, PPO patients, indemnity insurance patients. The universe of patients is available to them. Judge Chesney concluded we didn't even need to reach that aspect of the market as to noncustodial patients and why they aren't available, why they are not somebody to whom you could sell your services and still stay a competitor for the whole range of patients as they come up for competition from time to time. She said the first step is why do you not include county and city and all these other detainees? And they don't have a reason for that. They just say, well, you have to have a contract to provide services to them. Anybody can get a contract to provide services to them. There's no restraint on any of these services, CDCR or any other, from contracting with any hospital they want to. And as Judge Chesney pointed out, they've admitted that the hospital side of this market includes every hospital that can put a guard at their door and lock the window. And she said that can include every hospital. They haven't denied that. They acknowledge those other hospitals are in the market. Once they admit those hospitals are in the market, and they didn't try to change their complaint. They had the option. They've admitted that the complaint is the best they can do in this case. When Judge Chesney said all these other hospitals in the market, they've admitted that in their reply brief. So anyhow, just to conclude, we have a six-county geographic area. Every hospital in that area is part of the market. Mercy has imposed no restraint on any customer from doing business with any other hospital. Mercy has imposed no restraint on Colonial from doing whatever it wants with any other hospital. Mercy has imposed no restraint on anyone outside of Mercy from doing business the way they see fit. The only thing at issue in this case is Mercy's decision as to how it would like to organize its business model to best serve its customers, whether it's CDCR or any other. No impact on the market as a whole. This is just not an antitrust case. Thank you. Thank you, Mr. Thompson. Mr. Miller. Good morning, Your Honor. William Miller for Defense and FLE's Golden Empire Managed Care and Managed Care Systems. Two points quickly. A correction on a, I think, a misstatement by Mr. Bleacher about whether Colonial could admit other than through the emergency room. This whole case, if you look at the complaint, relates to the on-call procedure for the emergency room. There is not a word in this complaint that says you can't admit in other ways. Second, we, of course, adopt all that CHW and its counsel have argued in the papers and in before you today. The one area that GEMCARE is alleged to have violated the law that is different than with Mercy is on monopoly and attempt to monopolize. And I just would like to point out that, as Judge Chesney did, there are two different market definitions that are found in this complaint. One is the one that's found in paragraphs 9 and 10 that can be paraphrased as providing medical services to inmates in guarded or secure facilities. When you get to the allegations concerning Section 2 and relating to GEMCARE, here is what it says. GEMCARE has monopolized or engaged in an attempt to monopolize provision of medical services at Mercy Hospital. And as Judge Chesney pointed out and we would suggest to the Court, that's a different market and it can't sustain any scrutiny with respect to being a sustainable, relevant market for antitrust purposes. And as she further went on to say, even if you ignore that and go back to paragraphs 9 and 10, all of the flaws that have been pointed out in that market definition has equally applied to the monopoly claim and the monopoly claim simply cannot stand. One final point that just occurs to me is that there is, although counsel alleges in the complaint that there is a, quote, specialized care for inmates, the Court has never been asked to suspend its disbelief or its common sense. I know of nothing that would suggest that because someone is a, in the custody of the California penal system or any other penal system within California, that their treatment is or their conditions are any different from a medical perspective. If you have a heart condition when you're walking the street, when you're in a county jail, when you're in a State prison or a Federal prison, you need a cardiologist. There is no distinction because of a contract between CDCR and anybody. Thank you. Roberts. Thank you. All right. Mr. Miller? Mr. Miller, I've allowed you a minute. Thank you. I'll need to do this then in tick-point fashion. First of all, the core question is whether the market, other substitutes from the market, must be specifically alleged to survive 12b-6. Let me give you an illustration. I allege broccoli to be a relevant market. Defendant says, no, broccoli is reasonably interchangeable with string beans and asparagus. That's a factual issue. I don't have to go down the list of vegetables and say none of these are reasonable substitutes. I only need to allege that broccoli has peculiar characteristics and uses which make it an appropriate, relevant market. And if the other side doesn't agree to that, that's not for 12b-6. That's for, that's why Newcall says we deal with this afterward as a factual issue. Second, it is not correct if you read the complaint as a whole and look at the on-call procedure that we can, that Colonial can treat patients because the procedure is normally to admit them through the emergency room. Third, your question, if CDRC made an exclusive dealing arrangement with Mercy Hospital, I suspect we'd be out of court under the state action doctrine. But it's important to note here that they have not made that decision. They have not thrown in with an exclusive arrangement with Mercy. And in terms of whether a market can be restrained, a sub-market can be restrained by consumers, I'd ask you to look at, again, Newcall, page 1045, left column, page 1046, left column, and page 1051, left column. All of those state that a market can be restricted to specific consumer, a sub-market, maybe not a general market, but a sub-market can be so restricted. And finally, I don't have a problem with Pfizer. Pfizer is a merger case. The plaintiff alleged that the two merged parties defined a relevant market as all the pharmaceutical products that each of the two merged companies made. That's crazy. They make hundreds and hundreds of products. And all the court said is tell us which ones they compete upon so we can focus on whether or not this merger has some anti-competitive, potential anti-competitive effect. Mr. Flicker, you are well over your time again. Thank you. We thank counsel for the argument. Colonial versus Catholic health care is submitted. And with that, the court stands adjourned. All rise.
judges: Bybee, Murguia, Cjj Singleton (Alaska), Dj